CALOGERO, Justice.
On June 6, 1974 defendant was indicted by a grand jury for an aggravated rape, in violation of La.R.S. 14:42, which purportedly occurred on January 16, 1974 in Morgan City. Trial was held on July 8 and 9, 1974 and defendant was found guilty by a twelve man jury. In accord with the provisions of La.R.S. 14:42, defendant was then sentenced to the penalty of death.
Defendant has appealed to this Court, relying on four assignments of error in seeking to have his conviction and sentence reversed. In addition, he contends that selection of the jury was done in a manlier violative of the constitutional principles expressed in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), and he asks us to consider this alleged error of constitutional magnitude, despite the failure of trial counsel to object during examination and selection of the jury.
FACTS
The victim, a 19 year old girl who was in Morgan City on vacation visiting friends, was alone, asleep in a girl friend’s apartment when she was awakened at approximately 10:30 a.m. by the shaking of her bed. A male voice ordered her to shut up, and the intruder placed a butcher knife to her throat, telling her that he would kill her if she did not submit. He then proceeded to rape her twice.
The victim had been ordered to keep her eyes closed, but after the rape was completed, the intruder allowed her to open her eyes and they had a conversation lasting about five minutes. During this time, the victim obtained a good look at the intruder.
The conversation was terminated when one of the victim’s friends, a resident of the apartment in which the rape occurred, returned home for lunch. The intrüder hid in a closet. The victim went downstairs, admitted her friend, went back upstairs to the bedroom, changed from her night gown to her clothing, and then fled the apartment with her friend. The police were called, but the rapist had escaped by the time the police arrived at the apartment. A broken window screen in a vacant downstairs apartment suggested the means of entry to the dwelling. A note, reading “Meet me tonight out in front of the house at eight” was found on the victim’s bed.
During the afternoon, various police officers remained in the apartment investigating the rape. A female police officer was summoned to the apartment after one of the male officers answered a telephone call only to hear the caller hang up without speaking. It was decided that this patrolwoman would answer the telephone thereafter and would impersonate the victim in *149 the hope that the caller might be the rapist. She took a call from a person who identified himself as “Roy” and related that he was a friend of “John Smith,” the man who had been there that morning. Roy apologized for Smith’s behavior, saying that Smith’s mind was messed up and that he really was not the way he appeared to be that morning. About two hours later, the patrolwoman answered another call and recognized the voice as that of the same Roy. This time the caller identified himself as John Smith. He again apologized for what had happened that morning and attempted to arrange a meeting for that night so that he could return $50.00 which he had taken from the apartment. A meeting place was not immediately agreed upon, so the patrolwoman asked him to call again later. A third call was received about 7:30 p.m. and it was then agreed that the meeting would be at 8:00 p.m. at a small convenience store about a block from the apartment.
The victim agreed to cooperate in an attempt at the store to apprehend the rapist. While the police were stationed inside the store, she stood in front waiting for the rapist to approach. She remained there for about thirty minutes, during which time she viewed between fifteen and twenty black males, including approximately six men who matched the general description of defendant, enter the store. When the defendant approached her, she dropped her purse, which was the pre-arranged signal between her and the police. The victim, however, had moved out of the range of vision of the police and she realized that they had probably not seen the signal. After a brief conversation in which defendant suggested they leave in his car, she told defendant she needed to go into the store to buy cigarettes. Once in the store she informed the police that the rapist was standing outside by a telephone booth.
The defendant was then arrested by the police for rape and was informed that he had been identified. He responded by stating “Well, let her tell me that.” Thereupon, the victim was summoned over to the defendant by the officer, and she reaffirmed her identification.
After defendant’s arrest, search warrants were obtained for his mother’s home, in which he resided, and for his mother’s automobile, which he had driven to the store. Incriminating physical evidence was found at the home and in the automobile.[1]
ASSIGNMENT OF ERROR NO. 1.
Prior to trial, defendant filed a motion to suppress the identification, contending that “a one-on-one” identification procedure was used and that such a procedure was impermissibly suggestive and conducive to mistaken' identification contrary to due process standards enunciated in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). After a pretrial hearing, the trial court denied the motion to suppress, whereupon defendant objected to the ruling of the court and reserved a bill of exceptions. Defendant assigns the overruling of this motion to suppress the identification as his first assignment of error.
On the hearing on the motion two police officers attested to the facts discussed hereinabove relative to the calls, the stake-out, the identification and the arrest. The trial judge, in denying the motion, concluded that the identification procedure was a reasonable one, not violative of due process, in that the defendant had not yet been arrested and the identification at the pre-arranged meeting was the best way of apprehending him. He pointed out that the only other course available to the police would have been to arrest all persons fitting the description of the rapist who entered the store or came to the store that *150 night and then display such persons to the victim in a police conducted line-up.
Defendant in brief contends that this latter option is exactly what should have been done. He reiterates his contention that the procedure used was an impermissibly suggestive one-on-one identification procedure.
We disagree with defendant’s contention and find no merit in this assignment of error. We find that the procedure used in this case was not a one-on-one identification. As that term has been used, it refers to an identification procedure whereby the police, having a suspect in custody, show the suspect and only the suspect to the victim or witness of the crime. This type of custodial showing, with some few exceptions, has been held to be imper-missibly suggestive, in that the victim or witness may well be influenced by the fact that the authorities have the individual in custody, perhaps conveying an impression that he is the culprit. See State v. Newman, 283 So.2d 756 (La.1973).
Such a concern is not present in the instant case. The defendant was not in police custody. Furthermore, there was nothing about the procedure employed (actually as much a capture as an identification) which in any way can support an argument that it was suggestive. In no way was it suggested or implied to the victim that defendant was the rapist. Her identification was a completely independent one, based solely upon her memory of the rapist.
This assignment has no merit.
ASSIGNMENT OF ERROR NO. 2.
The defendant filed a pretrial motion to suppress taped recordings of the second and third telephone conversations between the policewoman and the caller who identified himself as “John Smith.” Defendant denotes the denial of this motion as assignment of error no. 2.
We note that the tape recordings of the conversation were not played for the jury during trial. The substance of those telephone calls were, however, presented to the jury during the testimony of the policewoman who took the calls. We will therefore address ourselves to defendant’s contention that the recordings, i. e., testimony concerning the substance of the telephone conversations, should have been suppressed.
Briefly, defendant’s contention is that the statements should have been suppressed because the police investigation had focused on “John Smith” and that defendant, alias Smith, was deceived or induced into making incriminating statements without being informed of certain of his constitutional rights.[2] It is defendant’s contention that the principles enunciated in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) were applicable, and that “John Smith” should have been informed of his right to remain silent, his right to an attorney, and the other rights required by Miranda.
There is no merit to this contention. In Miranda, the Supreme Court made it clear that that decision was to govern custodial interrogations. The Court stated:
“Our holding will be spelled out with some specificity in the pages which follow but briefly stated it is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we *151 mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.[4]

“[4]- This is what we meant in Es-cobedo when we spoke of an investigation which' had focused on an accused.”
It is apparent in the instant case that this “John Smith,” who circumstantially was shown to be defendant, was at the time of the incriminating telephone conversations neither in police custody nor deprived of his freedom in any way. Accordingly, we find no merit in the argument presented here.
ASSIGNMENT OF ERROR NO 3.
Under assignment of error no. 3, defendant presents two alleged errors, the first being the denial of his motion to suppress physical evidence, specifically, a pair of gloves, and the second being the introduction of the gloves into evidence during trial. The gloves were seized during a search of defendant’s mother’s automobile. Legal authority for the search of the automobile was premised upon both a properly issued search warrant and upon a consent to search form signed by defendant’s mother. Defendant disputes the validity of the search under each of those documents.
We shall consider defendant’s argument in regard to the search conducted under the authority of the search warrant. Defendant in no way disputes the validity of the warrant, but he does take issue with its execution. The warrant listed three particular things to be seized: 1) $50.00 in cash, 2) a piggy bank, and 3) a certain pair of pants and a shirt. Defendant contends that as the gloves were not specified on the warrant, they were improperly seized in violation of the Fourth Amendment.[3]
We do not find merit in this argument. Evidence obtained in the proper execution of a restricted search warrant issued on probable cause is admissible notwithstanding the fact that such evidence was not specified in the warrant. The validity of such seizure is based on the “plain view” doctrine, which allows seizure of evidence or contraband coming within the officer’s view as long as he had prior justification to be in a position to have that view. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); State v. Herron, 301 So.2d 312 (La.1974).
The gloves in the instant case were found under the front seat of the automobile which was being searched pursuant to the warrant. As any of the items detailed on the face of the warrant itself could easily have been hidden under the car seat, the officers were justified in searching that location, and when they discovered the gloves, which had been earlier described to them by the victim, the officers were legally entitled to seize them.
As we find that the gloves were properly seized during execution of the search warrant, and accordingly were admissible at trial, we need not address ourselves to defendant’s alternative argument that seizure of the gloves was invalid due to an alleged defect in the consent form signed by defendant’s mother and due to alleged improper execution of this consensual search.[4]
This assignment of error has no merit.
*152 ASSIGNMENT OF ERROR NO. 4.
In his final assignment of error, defendant contends that the trial court erred in denying his motion in arrest of judgment. Defendant argued in that motion that La.R.S. 14:42 is unconstitutional in that its provision for a sentence of death violates the Eighth and Fourteenth Amendments to the United States Constitution. Defendant in brief elaborates upon this contention and specifically argues that the constitutional infirmity lies in the fact that the jury may return a responsive verdict of attempted aggravated rape or simple rape neither of which carries the death penalty. Defendant contends therefore that the jury has the power to render the death penalty in a discriminatory manner, all in violation of the constitutional principles expressed in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
This same argument was presented in State v. Selman, 300 So.2d 467 (La.1974). The Court in Selman stated:
“Finally, we find no substance in the argument that by permitting a jury to render responsive verdicts, there still remains in the jury the uncontrolled discretion to impose the death penalty. The responsive verdicts for aggravated rape are as follows: guilty, guilty of attempted aggravated rape, guilty of simple rape, not guilty. The reason for this argument lacking merit is that the jury has no discretion in the imposition of the death penalty for aggravated rape. If the jury finds under the facts of the case that the accused is guilty of aggravated rape, the death penalty shall be imposed. On the other hand, if the jury finds under the facts of the case that the accused is either guilty of attempted aggravated rape or simple rape, they will render a verdict of guilty for that particular crime. We must bear in mind that attempted aggravated rape and simple rape are separate and distinct crimes with separate penalty provisions for each. The fact that death is the mandatory penalty for aggravated rape but not for the responsive verdicts of attempted aggravated rape and simple rape is of no moment. The sole determining-factor as to which penalty will be imposed depends upon the particular crime for which the jury finds the accused guilty, if any. Therefore, we conclude that there is no discretion in the jury for the imposition of the death penalty where the accused is found guilty of aggravated rape.
“Hence, the present death penalty in Louisiana for aggravated rape is constitutionally permissible. It does not violate the Eighth and Fourteenth Amendments to the United States Constitution.”
We have additionally upheld the Louisiana death penalty for murder, as contained in La.R.S. 14:30, despite the identical contention that the possibility of responsive verdicts to the charge of first degree murder affords a jury unbridled discretion in the imposition of the death penalty. State v. Roberts, La., 319 So.2d 317, decision *153 rendered September 5, 1975; State v. Hill, 297 So.2d 660 (La.1974).
These prior decisions are controlling. This assignment of error has no merit.
THE WITHERSPOON ISSUE.
While defendant’s specifications of errors are limited to the four which we have previously discussed, counsel for defendant in a supplemental brief filed in this Court urges an alleged error of asserted constitutional proportions, namely, that the trial court’s excusing two jurors for cause, where they allegedly did not make it unmistakably clear that they would automatically vote against the imposition of capital punishment without regard to the evidence, constituted a deprivation of due process of law under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Defendant requests that we look at the issue, and suggests that if we do not do so, the federal courts will. He cites in this regard Wigglesworth v. Ohio, 403 U.S. 947, 91 S.Ct. 2284, 29 L.Ed.2d 857 (1971).
 Our statutory procedure will not permit us to review this contention.[5] We hasten to point out, however, that the defendant does indeed have available to him other possible remedies, such as a petition for a writ of certiorari to the United States Supreme Court, or writ of habeas corpus. We do not mean to imply that we find merit in defendant’s argument that Witherspoon has been violated here. The state’s position on this issue incidentally is a persuasive one.[6]
*154 DECREE
Because we have found no merit in the four assignments of error and in view of our procedural limitation which preclude review of the issue raised in brief concerning a possible Witherspoon issue, we affirm conviction and sentence of the defendant.
MARCUS and BARHAM, JJ., concur.
TATE, J., concurs and assigns reasons.
DIXON, J., concurs in part and dissents in part and assigns written reasons.

. This recitation of the facts is obviously not complete, nor intended to be.

. In brief, defendant states that by advancing this argument, he in no way admits that he was the “John Smith” who made the telephone calls, but merely assumes that to be the case hypothetically, inasmuch as this was apparently the decision of the jury.

. Defendant also cites Article 1, § 5 of the Louisiana Constitution of 1974, which requires particularization of the “things to be seized.” As the search warrant was issued and the search conducted on or about January 16, 1974, long before the effective date of that Constitution, its provisions are inapplicable. In any event we do not feel that the cited provision would be authority in support of defendant’s position.

. We note in any event that there does not appear to be merit in defendant’s argument. His contention that the consent to search *152 form was invalid is based upon the fact that the form is a pre-printed one applicable to search of a house, and while the police scratched out the word house the first time it appeared in the form and substituted the word car, they failed to do so the second time the word house appeared.
In the body of the form, the police officer described the automobile by year, make, model, color, license plate number, and motor registration number. The evidence shows that defendant’s mother understood she was consenting to a search of her automobile.
The second argument presented is that the consent to search form only gave permission to search to the three officers who were named in the form, and that as the search was actually conducted by another officer, not one of those named in the form, the search and seizure were invalid. The evidence shows that the automobile was in police custody, and that when the officers who went to defendant’s mother’s house had obtained her consent to search the automobile, they radioed this information to the non-designated police officer, and he then actually conducted the search.

. At the time defendant was tried, Article 920 of the Code of Criminal Procedure provided that the Court’s review was limited to 1) formal bills of exceptions which had been submitted to and signed by the trial judge, and 2) errors discoverable by a mere inspection of the pleadings and proceedings. In addition, Article 841, C.Cr.P., expressly provided that an irregularity or error could not be availed of after trial unless it was objected to at the time of its occurrence and a bill of exceptions was reserved to the adverse ruling by the trial court. Failure to reserve a bill operated as a waiver of the objection.
It is undisputed that defendant did not object during the voir dire examination or when the two jurors were excused for cause. Defendant’s perfected bills of exceptions filed with the trial court did not include a bill of exceptions relative to that issue, and indeed his failure to object at the time the alleged error occurred precluded his filing such a bill. Consequently, that alleged error cannot be reviewed under Art. 920(1). Nor is the alleged error one discoverable by a mere inspection of the pleadings and proceedings, [See State v. Craddock, 307 So.2d 342 (La.1975), for a discussion of the type of errors considered discoverable by mere inspection], and therefore it cannot be reviewed under Art. 920 (2).
Shortly after defendant’s conviction, the Code of Criminal Procedure was amended, substituting assignment of errors for bills of exceptions. See Arts. 841, 844, and 920. As amended, Article 841 still requires an objection to be made, except to a ruling on a written motion, at the time an error or irregularity occurs. Consequently, under present law we are still unable to review an asserted error such as the one presented in this case.

. In Witherspoon, the Supreme Court held: “ . . .a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defend-fendant can constitutionally be put to death at the hands of a tribunal so selected. . . . To execute this death sentence would deprive him of his life without due process of law.” 391 U.S. 510, 522-23, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776.
Accordingly, the only veniremen who are to be excused are:
“those who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be develojjed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant’s guilt.” 391 U.S. 510, 522-23 n. 21, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776.
The state contends that the two prospective jurors who were challenged for cause were correctly excused under Witherspoon, and under Art. 798(2) (b), C.Cr.P., because each of the jurors stated essentially that he would automatically vote against the imposition of capital punishment without regard to any evi *154 dence that might be developed at the trial of the case.
The state’s principal contention, however, is that Witherspoon was not applicable to the jury selection in defendant’s trial. The state argues that the holding in Witherspoon was expressly limited to the discretionary sentencing function of a capital ease jury. In such a situation the Supreme Court held that it was a violation of due process to execute a death sentence imposed by a jury from which those citizens who had general objections to the death penalty had been excluded. While the argument was presented before it, that Court in Witherspoon refused to find that a jury devoid of individuals who had misgivings about the imposition of capital punishment was unable to make a just' determination of guilt or innocence.
The state points out that by virtue of amendments to the Criminal Code and the Code of Criminal Procedure, made after rendition of Furman v. Georgia, supra, the jury before which the defendant was tried did not have the discretion to impose either a death sentence or life imprisonment. (See La.R.S. 14 :42, mandating the death sentence for aggravated rape; Art. 814, C.Cr.P. limiting an aggravated rape guilty verdict to the single finding, guilty as charged, although also responsive are the verdicts guilty of attempted aggravated rape, guilty of simple rape, or not guilty; and Art. 817, C.Cr.P., providing that “any qualification of or addition to a verdict of guilty ... is without effect upon the finding.”) Their sole function was to make a finding of guilt or innocence. Consequently, the state argues that Wither-spoon was inapplicable.